1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10  DAVID DUANE PARKER,

11              Petitioner,              No. CIV S-02-1470 GEB JFM P

12       vs.

13  D. RUNNELS, et al.,

14              Respondents.        FINDINGS AND RECOMMENDATIONS

15  _____/

16              Petitioner is a state prisoner proceeding pro se with an application for a writ of

17  habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2000 conviction on

18  charges of first degree murder with special circumstances, kidnapping for robbery, carjacking and

19  robbery.  Petitioner was found guilty of first degree murder and the special circumstances of

20  lying in wait and committing murder during carjacking, kidnapping and robbery were found true;

21  petitioner was found guilty of all the other charged crimes as well.  The court sentenced

22  petitioner to life without the possibility of parole for first degree murder with special

23  circumstances and imposed, but stayed, sentences on all other counts.

24              Petitioner raises claims that his constitutional rights were violated by the trial

25  court's use of CALJIC No. 17.41.1, by the denial of his Batson challenge to the prosecution's use

26  of peremptory challenges and by the prosecution's knowing use of perjured testimony.

1

FACTS[1]

On the night of December 4, 1997, a California Highway Patrol officer stopped [petitioner] for driving 90 miles an hour on Highway 99 near Atwater.  Since he was driving a rented car on a suspended license and the renter was not in the car, officers impounded the car and gave him, his passengers, and their luggage a ride to a restaurant with a pay phone in the parking lot of a hotel across the street.  His passengers were Jameel Coles and three female juveniles, Nailah W. (Nailah) (who later pled guilty in juvenile court to accessory to murder) and Janelle G. (Janelle) and Myan J. (Myan) (both of whom later pled guilty in juvenile court to first degree murder [of the victim, Nathaniel Thompson]).

A long time friend of Thompson's saw him and his van in the parking lot of the restaurant at that time.  Nailah heard [petitioner] and Coles talk about needing a ride.  Myan asked Thompson for a ride.  [Petitioner], Coles, Nailah, Janelle, and Myan all got into Thompson's van with their luggage.  As Thompson drove, Nailah heard [petitioner] and Coles whispering to each other that they had to "get the man's van and ditch him somewhere."

After driving for awhile, Thompson got off the freeway, stopped by a pay phone, opened the sliding side door, and helped everyone take the luggage out of the van.  While he was doing that, someone "knocked [him] out" by hitting him in the head.  He fell halfway inside and halfway outside the van.  [Petitioner] said, "Shit, I busted my fist."

[Petitioner] and Coles put Thompson into the van.  Coles sat on top of him and pressed his knee into his back.  Myan helped hold him down.  As [petitioner] drove, Thompson came to and pleaded for them to let him go.  "He said you can take my car or my van and my keys, money and keys, just let me go."  [Petitioner] drove onto a side road and stopped the van.

[Petitioner] and Coles dragged Thompson out of the van and beat and kicked him as he lay on the ground.  Coles or Janelle smothered him with a pillow.  Coles poured kerosene from a lantern onto his body.  Myan struck a match to the kerosene and set his body on fire.  A passerby found his burned body the next morning.

[Petitioner] drove to Las Vegas, where the van was abandoned after Thompson's possessions were removed and the van was wiped down for fingerprints.  Police who questioned Nailah on

---

[1]  The facts are taken from the opinion of the California Court of Appeal for the Fifth Appellate District in People v. Parker, No. F035834 (February 21, 2002), a copy of which is attached as Exhibit D to Respondent's Answer, filed March 5, 2003 (hereafter "slip op.").

1  suspicion of prostitution later that month learned of the murder and
found the van after taking statements first from her and then from
2  Coles.  Police found Janelle's fingerprints on a window of the van.
Inside Coles's car, police found Thompson's cell phone and
3  [petitioner's] and Coles's fingerprints.

4  Other property missing from Thompson's body and van were credit
cards and a gold chain.  The cause of death was blunt force injury
5  to the right side of the head and brain.  The fatal skull fracture that
caused the brain to hemorrhage was consistent with kicking the
6  head, not with hitting the head with a fist.  The second degree
burns on the body were not a cause of death, as the burning
7  occurred at the time of or after death.

8  (People v. Parker, slip op. at 2-3.)

9  ANALYSIS

10  I.  Standards for a Writ of Habeas Corpus

11  Federal habeas corpus relief is not available for any claim decided on the merits in

12  state court proceedings unless the state court's adjudication of the claim:

13  (1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
14  determined by the Supreme Court of the United States; or

15  (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
16  State court proceeding.

17  28 U.S.C. § 2254(d).

18  Under section 2254(d)(1), a state court decision is "contrary to" clearly

19  established United States Supreme Court precedents if it applies a rule that contradicts the

20  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

21  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

22  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

23  (2000)).

24  Under the  "unreasonable application" clause of section 2254(d)(1), a federal

25  habeas court may grant the writ if the state court identifies the correct governing legal principle

26  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

3

1  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

2  simply because that court concludes in its independent judgment that the relevant state-court

3  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

4  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,

5  123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

6  review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

7        The court looks to the last reasoned state court decision as the basis for the state

8  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

9  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

10 habeas court independently reviews the record to determine whether habeas corpus relief is

11 available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

12 II. Petitioner's Claims

13     A.  Use of CALJIC 17.41.1

14        Petitioner contends the trial court erred by giving jury instruction CALJIC

15 17.41.1[2] because that instruction impinged upon his Sixth and Fourteenth Amendment rights to a

16 unanimous jury and to have the jury free to use its power of nullification.  (Petition, Attachment

17 B-1.)  In his petition, petitioner merely appended the cover sheet from his table of contents

18 contained in his Petition for Review submitted to the California Supreme Court.  (Compare

19 Petition, Attachment B-1-2 with Answer, Ex. E at i.)  Petitioner offers neither legal authority nor

20 any argument in support of this jury instruction claim herein.

21        The state court addressed this claim as follows:

22        [Petitioner] argues that the constitutional right to trial by jury
          entitles him to a unanimous verdict by a jury that is free to
23

---

24     [2]  CALJIC 17.41.1 reads as follows:  "The integrity of a trial requires that jurors, at all
       times during their deliberations conduct themselves as required by these instructions.
25 Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to
       disregard the law or to decide the case based on any improper basis, it is the obligation of the
26 other jurors to immediately advise the Court of that situation."  Id.

1  deliberate in secrecy and to use the power of nullification and that
   the trial court's instruction with CALJIC No. 17.41.1 violated that
2  constitutional guarantee.  (Citations omitted.)  Respondent argues
   the contrary.

3

4  The error, if any, in instructing with CALJIC No. 17.41.1 was not
   structural error requiring reversal per se.  (Citations omitted.)  The
5  standard of review instead is whether the record shows a
   reasonable likelihood the jury applied the challenged instruction in
6  a way that violates the Constitution.  (Citations omitted.)
   [Petitioner] cites no juror misconduct, juror coercion, jury
7  deadlock, or anything else in the record to even intimate the
   requisite showing.

8  (People v. Parker, slip op. at 16.)

9      "[I]t is not the province of a federal habeas court to reexamine state-court

10  determinations on state-law questions."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Federal

11  courts are required to defer to state court interpretations of state law unless the interpretation

12  violates due process, and "the fact that [an] instruction was allegedly incorrect under state law is

13  not a basis for habeas relief."  Id. at 71-72.  Federal habeas corpus relief is available on the basis

14  of instructional error only where the instruction was "not merely . . . undesirable, erroneous, or

15  even 'universally condemned,'" but that the instruction "so infected the entire trial that the

16  resulting conviction violates due process."  Cupp v. Naughton, 414 U.S. 141, 146-47 (1973).

17      Petitioner's claim that he was entitled to a unanimous jury was dismissed by the

18  district court's order of January 16, 2003.  (See also November 26, 2002 Findings and

19  Recommendations.)

20      The Court of Appeals for the Ninth Circuit has held that the use of CALJIC No.

21  17.41.1 does not violate a petitioner's constitutional rights.  Brewer v. Hall, 378 F.3d 952 (9th

22  Cir. 2004).  The Brewer court found that no Supreme Court precedent holds that an anti-

23  nullification instruction, such as CALJIC 17.41.1, violates due process, and thus the California

24  appellate court did not unreasonably uphold the constitutionality of CALJIC 17.41.1.  Brewer at

25  956.  Because Brewer is binding authority, petitioner's first claim should be denied.

26  /////

B. <u>Peremptory Challenges</u>

Petitioner's second claim for relief is that the trial court erred in denying his two motions pursuant to <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986)(racially discriminatory use of peremptory challenges violates the Equal Protection Clause of the Fourteenth Amendment) and <u>People v. Wheeler</u>, 22 Cal.3d 258 (1978),[3] which were based on the prosecutor's alleged improper exercise of peremptory challenges to strike two African Americans from the jury panel. Petitioner claims that the denial of the motions violated his equal protection and due process rights.

The state court addressed this claim as follows:

I. *Batson-Wheeler*

A. The Record

During voir dire, all prospective African-American jurors but two asked the trial court to be excused from jury duty.  Once the trial court granted those requests, two prospective African-American jurors remained on the venire.  One indicated on her jury questionnaire, "Oldest brother on Death Row" and "Son charged with sex with minor."  The trial court questioned her in chambers:

"THE COURT:  Anything about those experiences have any impact on you being a juror?

"A.  Only looking at these two young men my son is only 22 and I just like, oh if my son was in there for murder."

"THE COURT:  Tell me, is that going to have an impact on you?

"A.  I would like to say no.

"THE COURT:  You think you can sit and listen to evidence and base your decision on what you see and hear in the courtroom?

"A.  Probably.

"THE COURT:  You understand probably at this point is not good enough for me?"

---

[3]  <u>Wheeler</u> is the "California analogue" to <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). <u>Lewis v. Lewis</u>, 321 F.3d 824, 827 n.5 (9th Cir.2003).

Later, the trial court asked if she could put that "emotional baggage" behind her, listen to the evidence, and reach a decision. She replied, "Yeah, I can."

The other prospective African-American juror still on the venire indicated on her jury questionnaire that she "was saddened that young black men were on trial for the act" and added, "I really do not trust the police." The trial court queried her in chambers.

"THE COURT: You've indicated that you don't trust the police. What I need to know is would a police officer have a leg down as far as credibility goes before they've even testified just because of their occupation?

"A. From what I've seen on TV.

"THE COURT: You believe television is a reliable source of information?

"A. Yes.

"THE COURT: What I need to know is can you put that aside? Can you sit and watch and listen because a police officer has beaten up Rodney King or shot that young man in New York 41 times or things of that nature, can you put that aside and judge the credibility of what you see here in the courtroom?

"A. Yes."

The prosecutor exercised peremptory challenges against both of these prospective jurors. [Petitioner] made a *Batson-Wheeler* motion on the ground that the prosecutor was using peremptory challenges to excuse members of a cognizable group on the basis of group association rather than specific bias. (*Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258; see *Wade v. Terhune* (9th Cir. 2000) 202 F.3d 1190, 1195-1197):

"[COLES'S ATTORNEY]: Your Honor, with this last challenge the prosecution was eliminated the last African-American person from the venire panel that have [sic] been selected here. All of the African-Americans on the panel have either been excused by the prosecution or otherwise disqualified as many of the other folks have been disqualified.

"This being a case with an African-American victim and African-American prosecution witnesses, I'm a little surprised the prosecution has made sure that it doesn't have to try the case with any African-American face, therefore I'm requesting the court call additional jurors so that we can – my client can face a jury of his peers.

7

"THE COURT:  A Wheeler Motion?

"[COLES'S ATTORNEY]:  Yes, your Honor, making a Wheeler Motion and additionally because of the factors in this case I note that at this point I believe the prosecution has exercised only four challenges and I think each has been – with exception – half the four challenges were to the only African-Americans remaining on.

"[PETITIONER'S ATTORNEY]:  Joining in the motion."

The trial court replied:

"THE COURT:  During the course of the questioning the other members of the general pool[,] it appeared to be of African-Americans all requested to be removed with exception of two that came here today.  Those two were allowed to be excused.  The two I know very specific reasons had nothing to do with the color of their skin, why they would be excused.  However, for that reason I find no prima faci[e] showing."

At the trial court's invitation, the prosecutor made a record of his reasons for using peremptory challenges to strike the only two prospective African-American jurors still on the venire:

"[PROSECUTOR]:  Judge, with respect to [the one] juror. . . in her questionnaire she indicated that she really didn't trust the police.  She also said when asked in forming an opinion about what happened, the first thing she says is she was saddened any black men were put on trial for this act.  My feeling was based upon her lack of trust for the police and her first reaction being black men were on trial for this.  My feeling was she had an implied bias so that's why I asked to have her taken off the panel.

"With respect to [the other] juror . . ., in that case her brother is on death row, he was from Modesto, she has a 22 year old son.  She commented in court when she was in chambers that words to the effect if it was my son I don't know what I would do.  She also had a daughter – a son – that son was charged with a crime, so based upon those comments and those facts I felt that there would be some implied bias and I asked her to be taken from the panel.

The trial court denied the motion.

B.  The Law

[Petitioner] argues the trial court committed reversible error by finding no prima facie case of the prosecutor's improper use of peremptory challenges against African-Americans on the basis of group association rather than specific bias.  "It is well settled that

8

1   the use of peremptory challenges to remove prospective jurors
    solely on the basis of a presumed group bias based on membership
2   in a racial group violates both the state and federal Constitutions."
    (*People v. Turner* (1994) 8 Cal.4th 137, 164; U.S. Const. amend.
3   XIV; Cal. Const., art. I, § 16.)

4       Insofar as a motion alone can decide the question of
    whether the record shows a prima facie case, the four sentences of
5   the motion in the case at bar fail to do so.  The first sentence noted
    that "with this last challenge the prosecution has eliminated the last
6   African-American person from the venire panel."  The second
    sentence noted:  "All of the African-Americans on the panel have
7   either been excused by the prosecution or otherwise disqualified as
    many of the other folks have been disqualified here."  The third
8   sentence noted the case had "an African-American victim and
    African-American witnesses" but no "African-American face" on
9   the jury and asked the trial court to "call additional jurors" so each
    [petitioner] could "face a jury of his peers."[4]  The fourth sentence
10  noted that two of the four peremptory challenges the prosecution
    used were to excuse African-Americans.  The motion set out no
11  relevant circumstances like individual characteristics, questionnaire
    answers, or in-chambers statements of the two prospective jurors at
12  issue.  That offered "little practical assistance to the trial court."
    (*People v. Howard* (1992) 1 Cal.4th 1132, 1154).
13
14      Despite the lack of specificity in the motions, "other
    circumstances might support the finding of a prima facie case."
15  (*People v. Howard, supra*, 1 Cal.4th at p. 1155.)  Indeed, since
    rulings on *Batson-Wheeler* motions "require trial judges to
16  consider 'all the circumstances of the case,'" on review of a trial
    court order denying a motion "without finding a prima facie case of
17  group bias the reviewing court considers the entire record of voir
    dire." (*Ibid*.)  Asked by the trial court if she could "sit and listen to
18  evidence and base [her] decision on what [she] see[s] and hear[s]
    in the courtroom," the prospective juror whose brother was on
19  death row gave the tepid reply, "Probably."  Quite fittingly, the
    trial court told her that was just "not good enough."  Despite
20  voicing an opinion to the contrary in chambers, the other
    prospective juror flatly stated in her questionnaire, "I really do not
21  trust the police."

22      As with other findings of fact, the appellate court examines
    the record of a *Batson-Wheeler* motion "for evidence to support the
23  trial court's ruling."  (*People v. Howard, supra,* 1 Cal.4th at p.
    1155.)  As a ruling depends in part on personal observations by the
24  trial court, the appellate court reviews the record with
    "considerable deference."  (*People v. Sanders* (1990) 51 Cal.3d

25

26      [4]  On appeal, [petitioner] argues only the *Batson-Wheeler* motion and seeks no relief on
    the ground of the court's refusal to call additional jurors.

471, 498; cf. *Batson v. Kentucky, supra,* 476 U.S. at p. 88.)  Here, the trial court found "very specific reasons" that "had nothing to do with the color of their skin" to justify the prosecutor's use of peremptory challenges to the only two prospective African-American jurors still on the venire.  The record supports the trial court's findings of "grounds upon which the prosecutor might reasonable have challenged" the prospective jurors in question.  (See *People v. Bittaker* (1989) 48 Cal.3d 1046, 1092.)

(People v. Parker, slip op. at 4-8.)

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution.  See Batson v. Kentucky, supra; Johnson v. California, ____ U.S. ____, 125 S.Ct. 2410 (2005).  So-called Batson claims are evaluated pursuant to a three-step test:

First, the movant must make a prima facie showing that the prosecution has engaged in the discriminatory use of a peremptory challenge by demonstrating that the circumstances raise "an inference that the prosecutor used [the challenge] to exclude veniremen from the petit jury on account of their race." [Citation omitted.]  Second, if the trial court determines a prima facie case has been established, the burden shifts to the prosecution to articulate a [gender]-neutral explanation for challenging the juror in question.  [Citation omitted.]  Third, if the prosecution provides such an explanation, the trial court must then rule whether the movant has carried his or her burden of proving the existence of purposeful discrimination.

Tolbert v. Page, 190 F.3d 985, 987-88 (9th Cir. 1999) (en banc).

Petitioner's jury trial began on March 1, 2000, and he was found guilty on March 22, 2000.  (Clerk's Transcript ("CT") 482, 662.)  At that time, the Ninth Circuit Court of Appeals had found that California courts had been applying an impermissibly stringent test for determining whether a prima facie case existed under Batson.  Wade v. Terhune, 202 F.3d 1190 (9th Cir. 2000).  It wasn't until August 17, 2000, that the California Supreme Court held that in this context "strong likelihood" means a "reasonable inference" under California law.  People v. Box, 23 Cal.4th 1153, 1188, n.7 (2000).

/////

1    Thus, the trial court may have erred by initially finding petitioner had not made a

2 prima facie showing based on the trial court's belief that race played no role in the decision –

3 finding it was based on "very specific reasons [that] had nothing to do with the color of their

4 skin." (People v. Parker, slip op. at 6.)  "[T]he trial judge should have only required petitioner to

5 proffer enough evidence to support an "inference" of discrimination."  Johnson v. California, 125

6 S.Ct. at 2415.  For example, petitioner might have raised an inference of discrimination by

7 demonstrating that the prosecution had used 2 of its first four peremptory challenges to remove

8 the only 2 African American potential jurors from the jury box.

9    However, "[o]nce  a prosecutor has offered a race-neutral explanation for the

10 peremptory challenges and the trial court has ruled on the ultimate question of intentional

11 discrimination, the preliminary issue of whether the defendant had made a prima facie showing

12 becomes moot."  Hernandez v. New York, 500 U.S. 352, 359 (1991); U.S. v. Murillo, 288 F.3d

13 1126, 1135-36 (9th Cir. 2002), quoting Batson, at 359.  Unlike the trial court in Johnson, supra,

14 the trial court in the instant case went on to provide a record as to why the prosecution exercised

15 peremptory challenges of these two potential jurors.[5]

16    It appears the trial court in the instant case may have applied the more stringent

17 review of Wheeler,[6] so, in an abundance of caution, this court will perform a *de novo* review of

18

19    [5]  The trial judge in Johnson did not ask the prosecutor to explain the rationale for his
strikes; rather, the judge found Johnson had failed to establish a prima facie case under the
20 governing state precedent, People v. Wheeler, supra, reasoning that there had not "been shown a
*strong likelihood* that the exercise of the peremptory challenges were based upon a group rather
21 than an individual basis."  Johnson, at 2414.  The trial court in the instant case was initially
ruling on a Wheeler motion (Reporter's Augmented Transcript on Appeal ("RAT") 239), but did
22 not expressly state it was applying the "more likely than not" standard in its ruling.  After the
Wheeler motion was denied (RAT 240), petitioner's co-defendant's counsel stated he had
23 intended to bring a motion under Batson as well.  (RAT 241.)  The trial judge stated his rulings
were the same under either authority.  (RAT 241.)

24    [6]  "[W]here the [state] court has applied the wrong legal standard, AEDPA's rule of
deference does not apply."  Fernandez v. Roe, 286 F.3d 1073, 1077 (9th Cir.2002).  Under this
25 circumstance, a district court may review *de novo* the question of whether a defendant made a
prima facie showing of a Batson violation.  Id.; see also Cooperwood v. Cambra, 245 F.3d 1042,
26 1046-47 (9th Cir. 2001).

1  the record to determine whether the state court's denial of petitioner's <u>Batson</u> claim was error.

2  <u>See</u> <u>Paulino v. Castro</u>, 371 F.3d 1083 (9th Cir. 2004)(excusal of five out of six black jurors by

3  means of five out of six peremptories raised an inference of discrimination; case remanded for

4  prosecution to provide race-neutral reasons for the apparently-biased pattern of peremptories, and

5  determine whether the prosecutor violated <u>Batson</u>.)

6          "In evaluating the race neutrality of an attorney's explanation, a court must

7  determine whether, assuming the proffered reasons for the peremptory challenges are true, the

8  challenges violate the Equal Protection Clause as a matter of law."  <u>Hernandez</u>, 500 U.S. at 359.

9  "At this step, 'the issue is the facial validity of the prosecutor's explanation.  Unless a

10  discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be

11  deemed race-neutral.'"  <u>Stubbs v. Gomez</u>, 189 F.3d 1099, 1105 (9th Cir. 1999) quoting

12  <u>Hernandez</u>, 500 U.S. at 360.  "It is not until the *third* step that the persuasiveness of the

13  justification becomes relevant--the step in which the trial court determines whether the opponent

14  of the strike has carried his burden of proving purposeful discrimination."  <u>Purkett v. Elem</u>, 514

15  U.S. 765, 768 (1995) (emphasis in original).  For purposes of step two, the prosecutor's

16  explanation need not be "persuasive, or even plausible."  <u>Purkett</u>, 514 U.S. at 768.

17          As noted above, the state court of appeal found that the prosecutor's stated

18  reasons for exercising peremptory challenges were race-neutral.  The prosecution stated it

19  exercised its peremptory challenges because one juror had a brother on death row and a son who

20  had been charged with a crime, and the second juror had stated she did not trust the police.

21  (<u>People v. Parker</u>, slip op. at 6.)  That finding is fully supported by the record and by applicable

22  principles of federal law.

23          In the third step of a <u>Batson</u> challenge, the trial court has "the duty to determine

24  whether the defendant has established purposeful discrimination," <u>Batson</u>, 476 U.S. at 98, and

25  therefore must evaluate the "persuasiveness" of the prosecutor's proffered reasons, <u>see</u> <u>Purkett</u>,

26  514 U.S. at 768.  In determining whether petitioner has carried this burden, the Supreme Court

provides that "a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' " Batson, 476 U.S. at 93 (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)); see also Hernandez, 500 U.S. at 363. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett, 514 U.S. at 768; see also Lewis v. Lewis, 321 F.3d 824, 830 (9th Cir. 2003)("[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination.")

In this case, the Supreme Court's language is particularly helpful:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.   There will seldom be much evidence on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.   As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within the trial judge's province.

Hernandez, 500 U.S. at 365 (citations omitted).

Here, the prosecution explained that he exercised his peremptory challenge as to juror 7605 because in her questionnaire she stated she really didn't trust the police and, in "forming an opinion about what happened, the first thing she [said was] she was saddened any black men were put on trial for this act." (RAT at 239.)  The prosecution stated he believed juror 7605 had an implied bias, which is why he exercised the peremptory challenge.  (RAT at 240.) With respect to juror 7580, the prosecutor relayed that the juror had a brother on death row, he was from Modesto, and the juror had a 22 year old son.  (RAT at 240.)  During the questioning in chambers, juror 7580 commented that if it had been her son on trial for murder, she didn't know what she would do.  (RAT at 240.)  The prosecutor also recounted that juror 7580 had a son who had been charged with a crime.  (RAT at 240.)  Based on those facts and comments, the prosecutor stated he believed this juror had some implied bias, which is why he exercised a peremptory challenge to juror 7580.  (RAT at 240.)

13

1    A review of the trial judge's questioning of these jurors in chambers confirmed

2  jurors 7580[7] and 7605 had made these statements.  (RAT 203-05; 191-93.)  In addition, juror

3  7605 indicated a police officer would have a leg down as far as credibility goes based on what

4  she had seen on television, and stated she believed television was a reliable source of

5  information.  (RAT 192-93.)  When asked whether the fact that juror 7580 had a 22 year old son

6  and her initial reaction was "Oh, if my son was in there for murder," would have an impact on

7  her, juror 7580 responded "I would like to say no."  (RAT 204.)  When asked whether she could

8  sit and listen to evidence and base her decision on what she saw and heard in the courtroom,

9  juror 7580 responded "Probably."  (RAT 204.)

10   These facts and comments provide legitimate[8] reasons for the prosecution to

11  exercise its peremptory challenges.  In addition, however, two other, non-African-American

12  potential jurors were struck from the jury box for similar reasons.  Juror 1679 stated some

13  members of his family had been both the victim of some violent crimes and had been arrested for

14  or involved in the system in some way, and stated he had a negative experience with a police

15  officer.  (RAT 201-02.)  When asked whether that experience would impact his judging the

16  credibility of the officers here, juror 1679 responded, "No, I would probably judge them the same

17  as anybody else."  (RAT 202.)  Juror 1679 was later called to the jury box.  (RAT 233.)  The

18  prosecution exercised its peremptory challenge to strike Juror 1679.  (RAT 237.)  Juror 0654

19  indicated on his questionnaire that he had had a negative experience with a police officer.  (RAT

20  205.)  Juror 0654 was later called to the jury box.  (RAT 241.)  The prosecution exercised its

---

22  [7]  Although the trial judge calls this prospective juror 7582 during the questioning in
chambers (RAT 203), all other references to this juror are to 7580 (RAT 237, 240) and the court
23  referred to 7580 immediately after the prosecution challenged this juror and was the last juror
challenged prior to the defense raising the Batson/Wheeler objection.  (RAT 237-38.)  No other
24  juror claimed to have a brother on death row, so the single reference to 7582 appears to be a
typographical error or misstatement.

25  [8]  A "legitimate reason" is a reason that does not deny equal protection.  See Hernandez,
500 U.S. at 359; cf. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 ("The
26  explanation provided must be legally sufficient to justify a judgment for the defendant.")

14

peremptory challenge to strike Juror 0654.  (RAT 248.)  These challenges lend support to the prosecution's position that the peremptory challenges exercised against Jurors 7605 and 7580 were based on implied bias rather than a pretext for discrimination.

This court finds the reasons set forth by the prosecutor to be legitimate and race-neutral reasons for exercising peremptory challenges, and there is no reason to believe that the trial judge committed clear error in overruling petitioner's <u>Batson</u> objection.  Thus, this court finds there was no <u>Batson</u> error.

C.   <u>Use of Perjured Testimony</u>

Petitioner claims the prosecutor knowingly used perjured testimony to convict petitioner.  Petitioner contends Janelle and Myan committed perjury at the preliminary hearing because they denied being involved in the assault on the victim despite having entered admissions to first degree murder charges in juvenile court pursuant to a plea agreement. (Petition, Attachment D-1.)

The California Supreme Court summarily denied this claim.  (Respondent's Ex. F.)  This claim was rejected by the state appellate court on direct appeal on the ground that petitioner did not make the necessary showing of perjury:

> So far as the record shows, Janelle and Myan could have pled no contest to first degree murder not on the basis of physical participation in the murder but on the basis of conspiratorial agreement with [petitioner] so they, too, could reap the benefits of the stolen van.  Even the motion [petitioner] filed in the trial court acknowledges that when Janelle and Myan pled guilty to first degree murder they disagreed with the prosecutor's characterization of their role in the murder as one of physical participation.  Since the act of one conspirator is the act of all, each is responsible for everything his or her confederates do that follows even incidentally as a probable and natural consequence of the execution of the common design.  (Citation omitted.)  The necessary showing of perjury is entirely lacking.
>
> Even if there were a proper showing of perjury, other evidence of guilt was abundant.  Nailah testified that after [petitioner] and Coles planned to "get the man's van and ditch him somewhere" [petitioner] and Coles beat Thompson and stole his van and Coles poured kerosene from a lantern onto Thompson's body.  Coles

1   testified he did not douse his body but admitted kicking him,
2   helping to put him back into the van, and holding him down while
   [petitioner] drove and Thompson begged to be let go.  Coles
3   testified he had a "pretty good idea" they were going to keep the
   van and drive to Las Vegas, where police found the van with
4   Janelle's fingerprint on one of the windows and Coles's car with
   Thompson's cell phone and [petitioner's] and Coles's fingerprints
5   inside.  On the record, the admission of the testimony of Janelle
   and Myan, even if error, was harmless beyond a reasonable doubt.
6   (Citation omitted.)

7 (People v. Parker, slip op. at 10-11.)

8   "[A] conviction obtained by the knowing use of perjured testimony is

9 fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false

10 testimony could have affected the judgment of the jury."  United States v. Agurs, 427 U.S. 97,

11 103 (1976).  The same result obtains when the prosecutor, although not soliciting false testimony,

12 allows it to go uncorrected when it appears.  See Napue v. Illinois, 360 U.S. 264, 269 (1959); see

13 also United States v. LaPage, 231 F.3d 488, 492 (9th Cir.2000) (if prosecutor knows that his

14 witness has lied, he has a constitutional duty to correct the false impression of the facts).

15   "It is an established tenet of the due process clause that 'the deliberate deception

16 of the court by the presentation of false evidence is incompatible with the rudimentary demands

17 of justice.'"  United States v. Rewald, 889 F.2d 836, 860 (9th Cir. 1989) (quoting United States

18 v. Endicott, 869 F.2d 452, 455 (9th Cir. 1989)).  See also Morales v. Woodford, 388 F.3d 1158,

19 1179 (9th Cir. 2004).  "[A] conviction obtained by the knowing use of perjured testimony must

20 be set aside if there is any reasonable likelihood that the false testimony could have affected the

21 jury's verdict."  United States v. Bagley, 473 U.S. 667, 680 n.9 (1985).  See also Belmontes v.

22 Woodford, 350 F. 3d 861, 881 (9th Cir. 2003); Ortiz v. Stewart, 149 F.3d 923, 936 (9th Cir.

23 1998) ("If a prosecutor knowingly uses perjured testimony or knowingly fails to disclose that

24 testimony is false, the conviction must be set aside if there is any reasonable likelihood that the

25 false testimony could have affected the jury verdict.").

26 /////

1     There are two components to establishing a claim for relief based on the

2   introduction of perjured testimony at trial.  First, the petitioner must establish that the statements

3   were false.  United States v. Polizzi, 801 F.2d 1543, 1549-50 (9th Cir. 1986).  Second, the

4   petitioner must demonstrate that the prosecution knowingly used the perjured testimony.  Id.; see

5   also Morales, 388 F. 3d at 1180.  Mere speculation regarding these factors is insufficient to meet

6   petitioner's burden.  United States v. Aichele, 941 F.2d 761, 766 (9th Cir. 1991).  See Marcella

7   v. United States, 344 F.2d 876, 880 (9th Cir. 1965) ("Before a sentence may be vacated on the

8   ground of perjured testimony, the movant must show that the testimony was perjured and that the

9   prosecuting officials knew at the time such testimony was used that it was perjured.")

10     Myan and Janelle both testified at the preliminary hearing.  (CT 103-73; 187-229.)

11   Petitioner argued before the trial court that these witnesses had perjured themselves during the

12   preliminary hearing, and asked the court to set aside Myan and Janelle's plea agreement with the

13   district attorney.  (RT 711-14.)  The trial court denied the motion, stating inconsistent statements

14   did not necessarily equal falsehoods, and decided it could not at that time evaluate the credibility

15   of these witnesses.  (RT 715-16.)

16     Myan and Janelle also testified at petitioner's trial, and their trial testimony was

17   consistent with their testimony at the preliminary hearing.  (RT 755-846; RT 867-948.)

18   Petitioner's co-defendant Coles filed a motion for new trial on the grounds that the jury verdict

19   was based on perjured testimony, and petitioner joined in that motion.  (CT 667-68.)  On the day

20   of sentencing, the trial court heard and denied petitioner's motion for new trial based on this

21   claim of perjured testimony.  (RT 1243-47.)

22     Specifically, petitioner contends that Myan and Janelle lied at the preliminary

23   hearing and at trial to further their own self-interest, and in contravention of their earlier

24   statements made prior to the preliminary hearing as well as the terms of their plea agreement

25   which required they testify honestly.  Petitioner contends the prosecution was aware of these

26   variances in the testimony of Myan and Janelle, yet relied on it anyway, as evidenced by the

1   prosecution's closing argument where he repeatedly argued that petitioner and Mr. Coles killed

2   the victim.  Petitioner argues this reliance on the girls' testimony, where they essentially deny

3   their own personal involvement, laying the blame at the foot of Mr. Coles and petitioner,

4   demonstrates the prosecution was aware of their false testimony.

5           As further evidence of the prosecution's knowledge of this perjured testimony,

6   petitioner points out that the prosecution then switched tactics in his closing argument, going on

7   to assume that Myan and Janelle did perjure themselves, when he argued the girls were involved

8   with the pillow and suffocating efforts, further asserting that the men "involved the girls in

9   getting the pillows," which petitioner claims was unsupported by the record.  Petitioner also

10  argues that the prosecution relied on this false testimony when he argued that the men were in

11  charge of all aspects of the matter even if the girls did the actual killing because the girls were

12  prostitutes who were subordinate to the men, their pimps.  Petitioner contends this line of

13  argument turned the girls' testimony on its head:  arguing that the girls were prostitutes, that they

14  were going to Las Vegas to prostitute and were 16 year old girls acting at the behest of the men,

15  all in contradiction to the girls' actual testimony at trial.

16          The record, however, reflects a different story.  At the hearing on petitioner and

17  Mr. Coles' motion to set aside the plea agreement, the prosecution responded:

18              Basically, in asking witnesses to testify truthfully, we are just
                asking them to obey the law and do what the court would ask them
19              to do when they are sworn in.  They are not locked into the
                statement that they gave, although if the court would look at the
20              documents regarding their plea, it was clear at the time that there
                were conflicting statements of the events that took place on
21              Athlone Road.  There was no one at the time that these individuals
                had one version [sic], their version of the truth, and that there were
22              other statements that conflicted with that.

23              Our position is – a disclosure of every kind of conflicting piece of
                evidence and every benefit has been given to counsel.  They are
24              free to bring that out before the jury.  It's the jury's place to
                determine the credibility of these witnesses and we've done
25              everything we can to make any evidence which may be useful to
                the defense available to them.

26

                                            18

> Essentially as I understand it what counsel wants the court to do is
> become a 13th juror, have a hearing on the credibility of the
> witness and make a decision, and I would submit that's not the
> law.  The indications he cited as are cases having to
> do with where the people actually in fact know something is false
> or they intentionally suppress or evidence is suppressed, so there's
> a denial of due process.  That certainly is not the case here.

(RT 714-15.)  The trial judge found there was no question but that there were inconsistent

statements, but stated that "because there are conflicting statements doesn't make it necessarily

what they state here in court today is going to be untrue.  (RT 715-16.)

The discrepancies between each witness' account were fully aired to the jury.  Mr.

Coles testified that Myan and Janelle kicked the victim multiple times after the victim had been

hit by petitioner in the head.[9]  (RT 1006-07.)  Nailah Williams and Janelle testified that it was

petitioner and Mr. Coles who were kicking and beating the victim.  (RT 520, 884.)  Mr. Coles

also testified that Myan and Janelle put the pillow over the victim's head and held it there with

their knees and hands until the victim stopped moving.  (RT 994.)  Myan and Janelle, however,

testified they did not get out of the van.  (RT 781, 916.)

Myan testified that Mr. Coles got the lantern to pour kerosene over the victim's

body, but Myan stated she did not see who lit the match.  (RT 782.)  Mr. Coles testified that he

did not recall who retrieved the lantern, but that Myan lit the match.  (RT 995.)  Myan and

Janelle both testified they did not intend to nor did they engage in prostitution.  (RT 814, 923.)

Other witnesses testified that all of the girls were going to work as prostitutes.  (RT 534, 991,

996.)

The witnesses did agree on some details, including many acts attributed to

petitioner.  For example, they all testified it was petitioner who first knocked the victim

unconscious, planned to take the victim's van, drove the victim's van to a remote area where he

---

[9]  Mr. Coles initially implicated petitioner in this crime when Mr. Coles gave a tape-recorded statement to the Las Vegas Metropolitan Police Department on December 24, 1997. (CT 489, 498, 503.)

1   was murdered, and took part in disposing of the victim's property.  (RT 403, 576, 772, 992,

2   1003.)

3          Moreover, the jury was informed that Nailah Williams had been allowed to admit

4   being an accessory to murder, and that Janelle and Myan had been retained under juvenile court

5   jurisdiction in part because they agreed to testify against petitioner and Mr. Coles.  (RT 543-44,

6   757, 870.)  The jury was also instructed on how to treat discrepancies in testimony and weigh

7   conflicting testimony.  (CT 590, 591-92; RT 1074.)  The jury was specifically instructed to view

8   the testimony of Janelle and Myan with caution.  (RT 1082.)

9          Petitioner has provided no evidence that the prosecution knowingly used perjured

10  testimony.  He has provided no declarations refuting the testimony given by Myan or Janelle, or

11  supporting the testimony of Mr. Coles.  Petitioner merely speculates that the discrepancies

12  between their statements prior to trial and their statements at the preliminary hearing and trial

13  mean they perjured themselves in their statements to the court.  Petitioner speculates that the

14  prosecutor knew Myan and Janelle were lying, yet used their testimony anyway in order to obtain

15  the conviction.  That the prosecution argued the facts could be construed in various ways does

16  not demonstrate the prosecutor knowingly used perjured testimony in the trial.  It is not

17  uncommon for attorneys to argue alternative theories to the jury, particularly where eyewitness

18  accounts of crimes differ.  Moreover, the credibility of witnesses is always fair game in closing

19  argument.

20         The Ninth Circuit Court of Appeals has stated that mere inconsistences do not

21  establish the knowing use of perjured testimony.  U.S. v. Sherlock, 962 F.2d 1349, 1364 (9th Cir.

22  1992).  "Without knowledge of whose testimony was false, [the prosecution] could not have

23  knowingly presented perjured testimony."  Id.  There is no violation merely because a petitioner

24  alleges that false or perjured testimony was introduced.  Murtishaw v. Woodford, 255 F.3d 926,

25  959 (9th Cir. 2001).

26  /////

1     In addition, the jury was properly instructed that it could not find petitioner "guilty

2 based upon the testimony of an accomplice unless that testimony is corroborated by other

3 evidence which tends to connect such defendant with the commission of the offense." (RT

4 1080.)

5     Moreover, as petitioner pointed out in his motion for new trial, Myan and Janelle

6 were not the sole percipient witnesses.  Ms. Williams was available and did testify at the trial, as

7 did Mr. Coles.  Petitioner conceded that "the emotional statement by Mr. Coles [was] largely

8 consistent with the statement of Nailah Williams."  (Petition, Attached Motion for New Trial, at

9 2.)  Petitioner's fingerprints were found in the van.  California Highway Patrol Officer Chambers

10 testified that he wrote a ticket to petitioner for speeding in the rental car, and after impounding

11 the vehicle, dropped petitioner and his passengers at the Almond Tree Restaurant.  (RT 468, 470,

12 475.)  Albert Cotter, who knew the victim, placed the victim at the Almond Tree Restaurant

13 around that time, and testified that he saw two black men in and around the victim's van.  (RT

14 665, 668, 671.)  Fabian Valdez also testified he saw two black men and a black woman in and

15 around a van that resembled the victim's van.  (RT 676, 677, 679-80.)

16     It is possible the jury found petitioner guilty on this evidence alone, particularly

17 under an aider and abettor theory or probable and natural consequence theory.  Thus, petitioner

18 has not demonstrated that even if the testimony of Myan and Janelle was admitted in error, that

19 there is a reasonable likelihood it could have affected the jury verdict.

20     Therefore, the denial of this claim by the state court did not result in a decision

21 that was contrary to, or involved an unreasonable application of, clearly established Supreme

22 Court authority and was not based on an unreasonable  determination of the facts in light of the

23 evidence.  This claim for relief should be denied.

24     In accordance with the above, IT IS HEREBY RECOMMENDED that

25 petitioner's application for a writ of habeas corpus be denied.

26 /////

21

1    These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

3  days after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6  shall be served and filed within ten days after service of the objections.  The parties are advised

7  that failure to file objections within the specified time may waive the right to appeal the District

8  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  DATED:  August 22, 2005.

10

11                                                  UNITED STATES MAGISTRATE JUDGE

12

13  /001;park1470.157

14

15

16

17

18

19

20

21

22

23

24

25

26